UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 18-CV-60138-BLOOM

**NIGEL CHRISTOPHER MARTIN**

vs.

**UNITED STATES OF AMERICA,**

    **Respondent.**

_____/

**UNITED STATES' RESPONSE TO MARTIN'S MOTION
TO VACATE PUSUANT TO TITLE 18 U.S.C. SECTION 2255**

The United States of America, by and through the undersigned counsel, hereby files its response in opposition to Martin's Motion to Vacate Pursuant to Title 18 U.S.C. Section 2255 [D.E. 1], and states as follows:

*Background*

On December 16, 2016, a Grand Jury returned a Superseding Indictment charging Martin with Conspiracy to Commit Access Device Fraud, Access Device Fraud (including as an aider and abettor), and Aggravated Identity Theft, in violation of Title 18, United States Code, Sections 1029(b)(2), 1029(a)(2), 2, and 1028A(a)(1). Three co-defendants were charged with the same offense.

On January 6, 2017, Martin pled guilty to Access Device Fraud and Aggravated Identity Theft. Martin signed both a Factual Proffer and a Plea Agreement. In the Factual Proffer, Martin agreed to the following facts:

> On April 6, 2016, agents followed Co-conspirators David Christopher Isaacs and Tekle Mason to a Home Depot in Hialeah. Agents went inside and made contact with the manager and they watched Mason's activities on surveillance video. Agents saw Co-conspirator Mason do a telephone payment transaction for the purchase of items totaling $1,318.24. Home Depot allows

customers inside the store to do over the phone payment transactions. With this payment method, the customer inside the store provides the cashier with the telephone number of a third person who will provide payment information. The cashier calls the third person and the third person provides the cashier with the credit card number to be used as payment. The cashier will then input that credit card number to complete the sale.

For this April 6, 2016 telephone payment transaction witnessed by agents, Co-conspirator Mason provided the cashier with the telephone number for a third person. Simultaneous with providing the cashier with the telephone number for the third person, Co-conspirator Mason sent a text message to Co-conspirator Isaacs stating "look out for the call." The third person on the telephone provided the cashier with a Capital Visa credit card issued to "R.M.," ending in 5878.

The card was successfully charged for Co-conspirator Mason's items, totaling $1,318.24. Co Conspirator Mason then met back up with Co-conspirator Isaacs outside the Home Depot. After leaving the Home Depot, Co-conspirator Mason drove Co-conspirator Isaacs' to a nearby Wells Fargo parking lot. There, Co-conspirators Isaacs and Mason provided the items from Home Depot to another individual. Co-conspirator Mason often sold items purchased from Home Depot to contractors at a discount. For example: on April 28, 2016, Co-conspirator Mason sent a text message to a person labeled in his phone as "Carlos Electrician Shif Blood," stating "how is things? U need sumpn'?? We got Fridges n Stoves!!!;" and on March 12, 2016, Co-Conspirator Mason sent a text message stating "me deh ya wid [co-conspirator Sonchez Grant] a organize Wag wan wid Home Depot" and "just made a Depot run No orders?"

Later on April 6, 2016, agents followed Co-conspirators Isaacs and Mason to another Home Depot, located in West Dade. There, Co-conspirator Mason entered, picked up a few items and tried to purchase them with a card, but the cashier refused to do the transaction because he could not produce appropriate identification. Co-conspirator Mason then returned to Co-Conspirator Isaacs outside. Co-conspirator Isaacs then entered the Home Depot, went to the same cashier where Co-conspirator Mason had been, but per the cashier, he also could not produce appropriate identification and so no transaction occurred.

Capital One provided recordings of several phone calls made by Co-conspirators Isaacs and British Mitchell in which they called Capital One to: (1) complain when a Home Depot transaction on a victim credit card was not working; or (2) check the balance on a victim credit card. **Capital One also provided its fraud loss from Home Depot related to this conspiracy, which is in excess of $200,000. Home Depot, Lowes and other retail locations in which Capital One cards were used fraudulently also provided additional video surveillance of other co-conspirators engaged in the same fraudulent conduct witnessed by agents on April 6, 2016.**

2

> **One of those additional co-conspirators was MARTIN**. Home Depot video surveillance shows that on March 21, 2016, MARTIN purchased $782 worth of items, doing a telephone payment transaction with Capital One credit card, ending in 1619. Co-conspirator Mitchell purchased items at a Home Depot using that same credit card number on March 21 and 22, 2016. At the same time that MARTIN was at the Home Depot register on March 21, 2016, Co-conspirator Grant sent a text message to Co-conspirator Mason stating that "Legin," which is MARTIN'S first name backwards, had just made a "play," which is how they referred to these transactions.
>
> On April 18, 2016, MARTIN was at Home Depot with Co-conspirators Grant and Isaacs and assisted in loading into a vehicle items which had been purchased fraudulently. On March 29, 2016, Co-conspirator Isaacs called Capital One about a credit card (ending in 9140) from telephone number 561-284-9536, and identified himself as the cardholder, "N.F." He inquired about the available balance and asked the representative to note that "he will be using the card at Home Depot."
>
> On March 29, 2016, MARTIN went to a Home Depot in Broward and completed a telephone payment transaction for the purchase of items totaling approximately $369.94. The items were paid for with a Capital One credit card ending in 5887. MARTIN gave telephone number 561-284-9536 to the cashier, as the cardholder's telephone number. Capital One records show that telephone number 561-284-9536 was used to call regarding the account ending in 5887.

*See*, Factual Proffer [D.E. 68, Case No. 16-CR-60239] (emphasis added). Martin also signed a Plea Agreement. In the Plea Agreement, Martin acknowledged that he understood that the Judge would decide his sentence, and that he could not rely on any promises from anyone else regarding what his sentence would be. Specifically, paragraph 10 stated:

> The defendant is aware that the sentence has not yet been determined by the Court. The defendant also is aware that any estimate of the probable sentencing range or sentence that the defendant may receive, whether that estimate comes from the defendant's attorney, this Office, or the probation office, is a prediction, not a promise, and is not binding on this Office, the probation office or the Court.

*See*, Plea Agreement, paragraph 10 [D.E. 69, Case No. 16-CR-60239]. Martin also acknowledged that he understood that he wanted to plead guilty, even if such a plea would result

in his "automatic removal" from the United States. Specifically, paragraph 16 of the Plea Agreement stated:

> Defendant recognizes that pleading guilty may have consequences with respect to the defendant's immigration status if the defendant is not a citizen of the United States. Under federal law, a broad range of crimes are removable offenses, including the offenses to which defendant is pleading guilty. Removal and other immigration consequences are the subject of a separate proceeding, however, and defendant understands that no one, including the defendant's attorney or the Court, can predict to a certainty the effect of the defendant's conviction on the defendant's immigration status. **Defendant nevertheless affirms that the defendant wants to plead guilty regardless of any immigration consequences that the defendant's plea may entail, even if the consequence is the defendant's automatic removal from the United States.**

*See*, Plea Agreement, paragraph 16 (emphasis added). Additionally, the Court asked Martin whether any other promises had been made to him other than those set forth in the Plea Agreement, and Martin answered that there had been no other promises. The transcript from the change of plea hearing provides as follows:

> THE COURT: Has anyone made any promises or assurances to you, other than what's set forth in the Plea Agreement, to persuade you to plead guilty?
>
> THE DEFENDANT: No, Your Honor.

*See* Change of Plea Transcript, page 6 [D.E. 101, Case No. 16-CR-60239].

In paragraph 34 of the Final Presentence Investigation Report, ten points were added because the loss in this case was between $150,000 and $250,000. As a result, Martin's guideline range was 12-18 months for the Access Device Fraud, plus an additional consecutive 24 months for the Aggravated Identity Theft. Based on Martin's cooperation, the United States filed a Section 5K1.1 motion on his behalf. As indicated in Martin's motion, his attorney objected to the loss amount. After considering all of the filings, and hearing argument and witnesses at the sentencing hearing, the Court varied downward and sentenced Martin to 12 months imprisonment.

*Memorandum of Law*

In his Motion, Martin argues that his defense attorney was ineffective because he: failed to advise him that he faced mandatory deportation for entering a guilty plea to an aggravated felony; told him that the loss amount was less than $10,000; and promised him that he would be sentenced to less than one year in jail. According to Martin, he would not have pled guilty had he known he would face mandatory deportation. He asserts that he would have gone to trial even in the face of the compelling evidence against him.

As an initial matter, at any hearing in this matter, Martin's defense attorney would deny Martin's assertions. In any event, in the Plea Agreement, Martin acknowledged that he wanted to plead guilty even if it would result in his "automatic removal," and that he understood that the Judge would determine his sentence, and so he could not rely on any other promises made to him. And, while under oath at the change of plea hearing, he stated that no other promises, besides the ones in the Plea Agreement, had been made to him. Accordingly, Martin assertions are contradicted by the factual record in this case. As such, the United States respectfully suggests that Martin's motion should be denied.

Because collateral review is not a substitute for direct appeal, the grounds for collateral attack on final judgments pursuant to §2255 are extremely limited. A prisoner is entitled to relief under §2255 if the court imposed a sentence that (1) violated the Constitution or laws of the United States, (2) exceeded its jurisdiction, (3) exceeded the maximum authorized by law, or (4) is otherwise subject to collateral attack. *See* 28 U.S.C. §2255(a); *McKay v. United States*, 657 F.3d 1190, 1194 n.8 (11th Cir. 2011).

"Relief under 28 U.S.C. §2255 'is reserved for transgressions of constitutional rights and for that narrow compass of other injury that could not have been raised in direct appeal and

would, if condoned, result in a complete miscarriage of justice.'" *Lynn v. United States*, 365 F.3d 1225, 1232 (11th Cir. 2004)(citations omitted). It is also well-established that a §2255 motion may not be a substitute for a direct appeal. *Id*. at 1232. The "fundamental miscarriage of justice" exception provides that it must be shown that the alleged constitutional violation has probably resulted in the conviction of one who is actually innocent.

The Eleventh Circuit promulgated a two-part inquiry that a district court must consider before determining whether a movant's claim is cognizable. First, a district court must find that a defendant asserted all available claims on direct appeal. *McCoy v. United States*, 266 F.3d 1245, 1258 (11th Cir. 2001). Second, a district court must consider whether the type of relief the movant seeks is appropriate under Section 2255. This is because "[r]elief under 28 U.S.C. §2255 is reserved for transgressions of constitutional rights and for that narrow compass of other injury that could not have been raised in direct appeal and would, if condoned, result in a complete miscarriage of justice." *Lynn*, 365 F.3d at 1232-33.

Under Section 2255, unless "the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief," the court shall "grant a prompt hearing thereon, determine the issues and make findings of fact and conclusions of law with respect thereto."

**However, "if the record refutes the applicant's factual allegations or otherwise precludes habeas relief, a district court is not required to hold an evidentiary hearing." *Schriro v. Landrigan*, 550 U.S. 465, 474 (2007). *See also Aron v. United States*, 291 F.3d 708, 715 (11th Cir. 2002)(explaining that no evidentiary hearing is needed when a petitioner's claims are "affirmatively contradicted by the record" or "patently frivolous").**

Likewise, a §2255 movant must provide factual support for his/her contentions regarding counsel's performance. *Smith v. White*, 815 F.2d 1401, 1406–07 (11 Cir.1987). Bare, conclusory

allegations of ineffective assistance are insufficient to satisfy the *Strickland* test. *See Boyd v. Comm'r, Ala. Dep't of Corr's*, 697 F.3d 1320, 1333–34 (11th Cir. 2012).

Finally, the Eleventh Circuit has recognized that given the principles and presumptions set forth above, "the cases in which habeas petitioners can properly prevail ... are few and far between." *Chandler,* 218 F.3d at 1313. This is because the test is not what the best lawyers would have done or even what most good lawyers would have done, but rather whether some reasonable lawyer could have acted in the circumstances as defense counsel acted. *Williamson v. Moore*, 221 F.3d 1177, 1180(11th Cir. 2000). "Even if counsel's decision appears to have been unwise in retrospect, the decision will be held to have been ineffective assistance only if it was 'so patently unreasonable that no competent attorney would have chosen it.'" *Dingle*, 480 F.3d at 1099. The Sixth Circuit has framed the question as not whether counsel was inadequate, but rather counsel's performance was so manifestly ineffective that "defeat was snatched from the hands of probable victory." *United States v. Morrow*, 977 F.2d 222, 229 (11th Cir. 1992).

Here, Martin's claims about what his defense attorney told him are directly contradicted by both the Plea Agreement and his statements under oath at the change of plea hearing. In his Plea Agreement, he acknowledge that he wanted to plead guilty even it would result in his "automatic removal" from the United States. Further, contrary to Martin's assertions, the fact that his conduct in this case aided and abetted a loss in excess of $10,000 is clearly shown in the Factual Proffer, which indicates that the conspiracy caused a loss in excess of "$200,000."

Accordingly, because Martin's claim are clearly disproved by the facts of record in this case, the United States respectfully requests that the Court deny his Motion.

Dated: March 28, 2018

                          Respectfully submitted,

                          BENJAMIN GREENBERG
                          UNITED STATES ATTORNEY

By:   *Karen O. Stewart*
        Karen O. Stewart
        Assistant United States Attorney
        Florida Bar No. 0691011
        500 E. Broward Boulevard, Suite 700
        Fort Lauderdale, Florida 33394
        Tel: (954) 660-5798
        Tel: (954) 356-7336

## **CERTIFICATE OF SERVICE**

     I HEREBY CERTIFY that on March 28, 2018, I electronically filed this document with the Clerk of Court using CM/ECF.

                                                  s/ *Karen O. Stewart*
                                                  Karen O. Stewart, AUSA